UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

NICHOLAS CORY PLUG,                              Case No. 1:23-cv-01055

        Plaintiff,                              Hon.  Robert J. Jonker
                                             U.S. District Judge

    v.

COUNTY OF VAN BUREN, et al.,

        Defendants.
_____/

## REPORT AND RECOMMENDATION

### I.  Introduction

This Report and Recommendation (R. & R.) addresses Defendant's motion for summary judgment.  (ECF No. 64.)

Plaintiff Nicholas Cory Plug filed a complaint under 42 U.S.C. § 1983 alleging that Defendants Van Buren County, Sheriff Daniel Abott, Deputy Dillon Kelly, and Nurse Roslynn Hickmott violated his rights.  Plug says that Defendants violated the Fourth, Eighth, and Fourteenth Amendments to the U.S. Constitution while he was incarcerated in the Van Buren County Jail.  (ECF No. 1.)  He alleges that he was suffering with methamphetamine withdrawal at the time of his incarceration.  Plug says Defendants ignored this serious medical condition, which led to his preventable stroke.  Plug alleges that Deputy Kelly and Nurse Hickmott violated his rights by failing to recognize his stroke symptoms in a timely manner and send him sooner to the hospital to prevent long term harm.  Plug alleges that Defendants Van Buren County and Sheriff Daniel Abott failed to implement policies and procedures in the jail to monitor and provide medical care for inmates going through drug withdrawal

symptoms.   Further, Plug asserts that the County and Sheriff failed to train jail employees to provide proper medical care for inmates undergoing drug withdrawal.

Defendants move for summary judgment arguing that Plug has failed to properly plead a Fourteenth Amendment claim in his complaint, that Defendants Deputy Kelly and Nurse Hickmott could not have acted with deliberate indifference and that Plug has failed to show that he had a serious medical need.   Further, Deputy Kelly and Nurse Hickmott argue that they are entitled to qualified immunity from liability.   Defendants Van Buren County and Sheriff Abott argue that Plaintiff's municipal claims fail because he can not identify a policy, procedure, or custom that violated his rights.   In addition, they argue that Plug has failed to properly establish a failure to train claim that caused a violation of his rights.

For the reasons explained below, it is respectfully recommended that the Court grant Defendants Kelly, Abott, and Van Buren County's motion for summary judgment and dismiss them from this action.   It is further recommended that the Court deny Defendant Hickmott's motions for summary judgment.

## II.   Factual Allegations

Plug was arrested on October 5, 2020, and placed in the Van Buren County Jail.   He alleges that despite having methamphetamine withdrawal, he was left unmonitored by Defendants and he suffered a preventable stroke.   (*Id*., PageID.4-5.) Plug alleges that Defendants failed to monitor him in a detox cell and denied him medical care for two days after he suffered a stroke.   (*Id*., PageID.5.)

Plug alleges that Van Buren County failed "to properly train, retain, investigate, monitor, discipline, and/or supervise the individual Defendants."  (*Id*., PageID.6.)    Allegedly, the County failed to "promulgate and enforce proper procedures, guidelines, practices, and polices to minimize as far as practical all foreseeable risks of harm."  (*Id*.)

Plug alleges that, as a pretrial detainee, the individual Defendants owed him a duty to properly monitor his health and physical condition; ensure proper protocols existed for management of individuals with medical needs; diagnosis and treat; regularly check for symptoms of drug withdrawal and medical illness; and to treat obvious serious medical needs with an immediate referral to an appropriate medical professional.  (*Id*.)    Plug alleges he exhibited symptoms of shortness of breath, diarrhea, uncontrollable coughing, incontinence, loss of consciousness, loss of appetite, and inability to coherently speak.  (*Id*., PageID.7.)    Plug alleges that the failure to place him in an "observable detoxification cell and withholding medical care for many days was grossly negligent."  (*Id*.)

Upon his arrival at the jail, Plug was booked by Deputy Kelly and evaluated by Nurse Hickmott.  (*Id*., PageID.8.)    The notes indicate that Plug "appears to be under the influence of alcohol or drugs or has visible signs of withdrawal, extreme perspiration, pinpoint pupils, shakes, nausea, cramping, vomiting" and had ingested methamphetamine the evening before.  (*Id*.)    Over the next 11 days, Defendants and other jail personnel noticed that Plug exhibited odd behaviors, such as being

3

lethargic, confused, urinating on himself, having difficulty feeding himself, and having difficulty speaking intelligibly.   (*Id.*, PageID.7-8.)

Plug alleges that his "recorded last known well time was October 14, 2020." (*Id.*, PageID.9.)   Plug was taken to the Bronson Lakeview Hospital on October 16, 2020.   (*Id.*)   A CT scan "showed a large acute infarction in the left frontal lobe" and other sites of infarction.   (*Id.*)   Plug's hepatic function panel was abnormal.   (*Id.*)   Plug was diagnosed critical with possible pneumonia, an acute ischemic left MCA stroke, methamphetamine abuse, aphasia, and high blood pressure.   (*Id.*)   Plug was transferred to Bronson Methodist Hospital.

While there, Todd C. Bennet, DP, noted that "patient seems to have presented later in process so likely already 48 hours past stroke event." (*Id.*)   After two weeks of care at Bronson Methodist Hospital, Plug continued rehabilitation at Mary Free Bed for two weeks.   (*Id.*)   Plug required in-patient rehabilitation and 24-hour assistance after these events.   (*Id.*, PageID.10.)

Plug asserts that Defendants violated his Eighth Amendment and Fourteenth Amendment rights by deliberately denying him medical care.   (*Id.*, PageID.10-11.) Plug's asserts that "Defendants violated the United States Constitution, particularly the Eighth and Fourteenth Amendments."   (*Id.*, PageID.11.)   Plug alleges that the County and Sheriff failed in providing medical care and failed to "implement and monitor an adequate hiring and training program for all officers and deputies working at the County Jail."   (*Id.*, PageID.11-12.)   Plug says Defendants policies, practices and procedures deny incarcerated individuals who manifest signs of drug

withdrawal "proper housing and observation in a detoxification cell" and medical care for serious medical needs.   (*Id.*, PageID.12.)

## III.   Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."   *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

## IV.   Eighth and Fourteenth Amendments

First, Defendants argue that Plug failed to properly plead a Fourteenth Amendment cause of action.   Second, Defendants argue that Plug's improper reliance on the Eighth Amendment to assert his deliberate indifference claim requires dismissal.   (ECF No. 65, PageID.424-426.)   Finally, Defendants assert that even if the Court finds that Plug alleged a Fourteenth Amendment claim, his

5

claim necessarily fails because his medical condition was not obvious and Defendants did not act recklessly by disregarding a high risk of harm.

Defendants focus on Count I of the complaint.   Defendants seem to argue that the inclusion of only the Eighth Amendment in the heading of Count I limits Plaintiff's claim.   The heading states: "COUNT I – FEDERAL CONSTITUTIONAL VIOLATIONS EIGHTH AMENDEMNT".   (ECF No. 1, PageID.10.)   Defendants are correct that the Fourteenth Amendment applies to this case because Plug was a pretrial detainee at the time of his incarceration at the Van Buren County Jail.   In the body of Count I, Plug asserts:

> 43. These actions on the part of all Defendants violated the United States Constitution, particularly the Eighth and Fourteenth Amendments, which is actionable pursuant to 42 U.S.C. §1983.

(*Id.*, PageID.11.) In the opinion of the undersigned, Plug adequately alleged a Fourteenth Amendment cause of action in Count I.

The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes and requires prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency.   *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner.   *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).   Because Plug was charged with a crime but not convicted at the time of his detention[1], the Eighth Amendment's

---

[1]   Plug   was   convicted   of   controlled   substance   delivery/manufacture   of

6

protection against deliberate indifference to the serious needs of a prisoner is not directly applicable.

The Eighth Amendment protections extend to pre-trial detainees through the Fourteenth Amendment's Due Process Clause.  *Whitley v. Albers*, 475 U.S. 312, 327 (1986).  Until recently, the Eighth Amendment deliberate indifference subjective standards applied to pre-trial detainees bringing medical care claims through the Fourteenth Amendment.  In *Richmond v. Huq et al.*, 885 F.3d 928 (6th Cir. 2018), the Sixth Circuit reserved deciding whether, in the context of a failure to provide medical care, *Kingsley v. Hendrickson*, 576 U.S. 389 (2015) eliminated the requirement of proving the subjective prong of the deliberate indifference test for pre-trial detainees under the Fourteenth Amendment.  In *Brawner v. Scott Cnty., Tennessee,* 14 F.4th at 585, 597 (6th Cir. 2021), the Sixth Circuit found that under the subjective component of the deliberate indifference analysis, a pre-trial detainee only needed to show recklessness – "more than negligence but less than subjective intent – something akin to reckless disregard."  *Id.* (citation omitted).

In *Greene v. Crawford County*, 22 F.4th 593 (6th Cir., 2022), the Sixth Circuit clarified that a pre-trial detainee establishes the subjective standard by showing a defendant either intentionally ignored a serious medical need or recklessly failed to act reasonably to mitigate the risk posed by a serious medical need.  *Id.* at 607.  To satisfy the objective component of a deliberate indifference claim, the Eighth

---

methamphetamine and sentenced on December 19, 2022, to 4 years to 20 months imprisonment. (ECF No. 65, PageID.417); https://mdocweb.state.mi.us/OTIS2/otis2profile.aspx?mdocNumber=444996

Amendment standard still applies.   A pre-trial detainee must establish that the medical need at issue is sufficiently serious.   *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).   In other words, the pre-trial detainee must show that he is incarcerated under conditions posing a substantial risk of serious harm.   *Id.*   "Accordingly, plaintiff must show (1) that [he] had a sufficiently serious medical need and (2) that each defendant "acted deliberately (not accidentally), [and] also recklessly 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'"   *Helphenstine v. Lewis Cnty., Kentucky,* 60 F.4th 305, 317 (6th Cir. 2023), cert. denied, 144 S. Ct. 692, 217 L. Ed. 2d 388 (2024), (citing *Brawner*, at 596, quoting *Farmer*, at 836).

"[A]n inmate who complains that **delay in medical treatment** rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." *Napier v. Madison Cty., Ky.*, 238 F.3d 739, 742 (6th Cir. 2001) (emphasis added, citations omitted).   The Court of Appeals elaborated on the holding in *Napier* in its 2004 ruling in *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890 (6th Cir. 2004), where the Court stated the following:

> *Napier* does not apply to medical care claims where facts show an obvious need for medical care that laymen would readily discern as requiring prompt medical attention by competent health care providers. *Napier* applies where the plaintiff's "deliberate indifference" claim is based on the prison's **failure to treat a condition adequately**, or where the prisoner's affliction is seemingly minor or non-obvious. In such circumstances, medical proof is necessary to assess whether the delay caused a serious medical injury.

*Blackmore*, 390 F.3d at 898 (emphasis added).   Thus, *Napier* and *Blackmore* provide a framework for assessing a claim of delayed or inadequate care for a non-obvious condition:   A plaintiff making this type of claim must place verifying medical evidence in the record to show the detrimental effect of the delayed or inadequate treatment.

However, the objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person." *Blackmore*, 390 F.3d at 899.   "A sufficiently serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Helphenstine*, at 318.

In *Helphenstine*, the plaintiff was arrested and taken to jail where he began to show signs of alcohol or drug withdrawal such as severe vomiting and diarrhea.   He died Five days later.   During the days preceding plaintiff's death, deputies monitored plaintiff in a detox cell and telephoned a private doctor who the County paid to care for inmates.   The plaintiff was observed laying down most of the day, was vomiting, had soiled himself, and refused to eat or drink.   The Sheriff contacted the judge who had scheduled plaintiff's arraignment and informed him that plaintiff was out of it, not making sense and incoherent.   The arraignment was cancelled and the Sheriff walked plaintiff back to the jail.

The doctor was notified and indicated that plaintiff should be taken to the hospital but plaintiff allegedly refused.   The doctor faxed a prescription (an

9

antiemetic) and plaintiff allegedly refused to go to the hospital a third time. The doctor never visited the jail or treated plaintiff.   After his second dose of the prescription drug, plaintiff reported that he would never drink again, and that he was feeling better.   After Midnight, plaintiff was shaking and occasionally twitching while lying face down on a mat. Plaintiff died a few hours later from withdrawal or severe dehydration caused by withdrawal.   Plaintiff's death certificate listed his cause of death as chronic substance abuse with the presence of therapeutic levels of fentanyl.

First, the Sixth Circuit rejected the Defendants' argument that Helphenstine could not satisfy the objective element for two reasons.   The Sixth Circuit found that vomiting is a clear manifestation of internal physical disorder, and the recognition that plaintiff needed continued observation tends to show a sufficiently serious medical need.   *Id.*, at 318.   Further, the act of sending a fax to a doctor indicating that the plaintiff was vomiting, soiling himself, refusing to eat, and not sleeping was an indication that plaintiff had a serious medical need.   *Id.* at 318-19.   These factors were significant enough for a reasonable jury to find that jail officials acted with deliberate indifference.   *Id.*   Second, the Sixth Circuit concluded that the objective element was satisfied because a reasonable jury could conclude that some of the Defendants recklessly disregarded a known risk to Helphenstine's health based upon their observations that his condition – vomiting, soiling himself, refusing to eat, not sleeping, and finally in a near lifeless state – required medical attention.

### 1.  Defendant Deputy Kelly

Plug asserts that former Deputy Kelly acted as the booking officer in the Van Buren County Jail.[2]   (ECF No. 1, PageID.8.)   Deputy Kelly indicated that Plug appeared under the influence of alcohol or drugs or was in withdrawal due to smoking or snorting methamphetamine the day before.   (ECF No. 65-1, PageID.446; ECF No. 69-2, PageID.576-577.)

| 4 | Appears To Be Under The Influence Of Alcohol Or Drugs Or Has Visible Signs Of Withdrawal? (Extreme Perspiration, Pinpoint Pupils, Shakes, Nausea, Cramping, Vomitting) | Yes |
|---|---|---|

(*Id.*)  Plug was given a COVID-19 assessment at the time of booking which indicated:

4.   Have you, or anyone you have been in contact with, had laboratory confirmed Coronavirus?
      ☒No  ☐Yes  (The incubation period is 2-14 days).

5.   Have you, today or in the last 7 days, had any of the following symptoms:
      ☐No, ☒Yes  Fever or Feverish?      If YES, take and document temperature.
            Temperature Taken: Results / Date / Time: _97.3_____.
      ☐No, ☒Yes  Shortness of breath or other symptoms of lower respiratory illness?
      ☐No, ☒Yes  Diarrhea?      If YES, ☐Black  ☐Bloody  ☐n/a
      ☐No, ☒Yes  Uncontrollable coughing?

(ECF No. 69-2, PageID.578.)

Plug testified that he told Deputy Kelly that he had high blood pressure and was taking lisinopril.   (ECF No. 69-3, PageID.597.)   That information was not listed on the booking form.

| 19 | Are You Taking Any Medication? If Yes, What? | No | |
|---|---|---|---|

---

[2]      Kelly testified that he worked at the jail for less than one year.   (ECF No. 69-6, pageID.720.)

(ECF No. 69-2, PageID.578.)

Plug alleges that Deputy Kelly observed him over the next 11 days exhibiting "odd behavior such as being lethargic, confused, urinating on himself, difficulty feeding himself, and difficulty speaking, and trying to say words that were unintelligible." (ECF No. 1, PageID.9.) Plug alleges that Deputy Kelly denied him medical attention for an obvious serious medical need. (*Id.*, PageID.10.)

Kelly testified that he logged the booking information digitally and he assumed that it went to the medical team. (ECF No. 69-6, PageID.730.) If an inmate had any medical issue "as small as a headache" he would notify a jail supervisor and a jail nurse or member of the medical staff. (*Id.*, PageID.734.) Deputy Kelly testified that he "was not medically qualified" to evaluate medical conditions. (*Id.*, PageID.738-739.) Kelly testified that he did not remember booking Plug on October 5, 2020. (*Id.*, PageID.752.) Deputy Kelly did not recall if Plug received a medical evaluation the day of booking. (*Id.*, PageID.763.) He further testified that "any inmate who came into the jail would automatically get a medical eval." (*Id.*, PageID.764.) Deputy Kelly testified that his only other involvement with Plug would have been "walking through the cell, keeping an eye on everybody, making sure nobody is doing anything they shouldn't be" doing. (*Id.*, PageID.767.)

Deputy Kelly testified that he does not recall if nurse Hickmott informed him that Plug "was not being able to speak appropriately, and that he was sleeping for most of the day, that he had urinated on himself." (*Id.*, PageID.784-785.) If he

12

noticed any changes to Plug's medical condition he would have noted his observations in the medical file.  (*Id.*, PageID.786.)   Kelly further testified regarding events that occurred on October 16, 2020:

> I remember, that night, he approached me as I was doing my rounds. He said he wasn't feeling right. So I pulled him out of his cell, sat him outside the guard station, talked to him for a minute, tried to figure out what was going on, realized there was a medical issue, tried getting in touch with Sergeant Darue.
>
> I didn't get ahold of Sergeant Darue; so I called the on-staff doctor. And then the on-staff doctor said, "Does he need to go to the hospital?" I said, "I'd feel more comfortable with going to the hospital." He, then, was escorted, with another officer, to the hospital where he was seen for medical attention.

(*Id.*, PageID.786-787.)

Despite the allegations that Deputy Kelly observed Plugs medical condition leading up to his stroke, the evidence presented shows that Deputy Kelly was involved with Plug at booking and right before Plug was sent to the hospital.   During booking on October 5, 2020, Deputy Kelly observed that Plug was withdrawing from methamphetamine which included: "Extreme Perspiration, Pinpoint Pupils, Shakes, Nausea, Cramping, and Vomit[]ing."   (ECF No. 65-1, PageID.446; ECF No. 69-2, PageID.576-577.)   Furthermore, Kelly wrote on a COVID-19 Questionnaire that Plug reported feeling feverish, having shortness of breath, diarrhea, and uncontrollable coughing. (ECF No. 69-2, PageID.578.); *Helphenstine*, 60 F.4th at 318-19 (withdrawal symptoms including "vomiting is a clear manifestation of internal physical disorder").   Then, on October 16, 2020, Deputy Kelly testified that he thought Plug should go to the hospital.   *Id.*, at 318 (finding a genuine issue of fact

13

where a lay person recognized that the inmate's "condition was serious enough that he needed medical attention").   In both instances, on October 5 and 16, 2020, Deputy Kelly observed Plug in obvious distress.   In the opinion of the undersigned, a genuine issue of material fact exists regarding whether Deputy Kelly was aware that Plug presented with a serious medical need on those dates.

"The key question in this case goes to deliberate indifference: Did the officers act 'recklessly in the face of an unjustifiably high risk' that is either 'known or so obvious that it should be known'?" *Id.*, at 316-17 (quoting *Brawner*, 14 F.4th at 596-97).   In the opinion of the undersigned, Deputy Kelly did not act recklessly on either October 5 or October 16, 2020, when he evaluated Plug's medical condition.   Rather, the facts establish that Deputy Kelly acted appropriately.   On October 5, 2020, when acting as the booking officer, Deputy Kelly recorded Plug's symptoms and placed him in an observation cell.   And, on October 16, 2020, while performing rounds in the jail, Deputy Kelly spoke with Plug after he told him he was not feeling well, called the jail doctor after he was unable to contact his supervisor, and recommended that Plug should be taken to the hospital.   Under these circumstances, there exists no genuine issue of material facts on the subjective element of Plug's Fourteenth Amendment claim against Deputy Kelly.   In the opinion of the undersigned, Deputy Kelly did not act recklessly in regard to Plug's serious medical condition.   Rather, on the two occasions that he was involved with Plug, he documented Plug's symptoms and placed him in an observation cell on October 5, 2020, and he contacted the jail

doctor on October 16, 2020, and recommended that Plug should be sent to the hospital.   Deputy Kelly acted appropriately, based upon the record before the Court.

### 2.    Defendant Nurse Hickmott

Plug alleges that Nurse Hickmott evaluated him at booking and noted that he "appears to be under the influence of alcohol or drugs or has visible signs of withdrawal, extreme perspiration, pinpoint pupils, shakes, nausea, cramping" and vomiting and that he ingested methamphetamine the evening before.   (ECF No. 1, PageID.8.)   Nurse Hickmott testified that she did not examine or see Plug during his "intake, on October 5, 2020."   (ECF No. 69-7, PageID.838.)   Plug alleges that Nurse Hickmott failed to provide him with medical care for his "obvious serious medical needs".   (ECF No. 1, PageID.10.)

Nurse Hickmott testified that booking information is reviewed by someone from the medical staff to determine if the inmate needs immediate attention or whether they can wait until they receive a physical within 14 days.   (ECF No. 69-7, PageID.830.)   Nurse Hickmott testified that the booking form indicated that the officer thought Plug "was under the influence of something, but he didn't take any medicines, he didn't have any kind of medical problems in his background."   (*Id.*, PageID.839.)

When she evaluated Plug, "most of his vital signs were all within normal limits."   (*Id.*, PageID.846.)   Nurse Hickmott testified that medical staff use a detox protocol form for methamphetamine users who are evaluated at least twice per day. (ECF No. 69-7, PageID.859.)   Nurse Hickmott did not fill out the form for Plug but

took his vital signs "just because" and "[n]ot so much for his meth consumption; we probably took them for other reasons".  (*Id.*, PageID.860.)   When she was speaking to Plug, "he wasn't unresponsive because he responded to me and he mumbled at times."  (*Id.*, PageID.864.)   She further stated that she did not "see all those signs and symptoms of incontinence and stuff like that at that time."  (*Id.*, PageID.866.)

On October 9, 2020, Nurse Hickmott examined Plug and noted:

> That he was complaining of cough and he was short of breath when he was laying down. That he's a large man. His skin was warm and dry. The COVID test was done. He said he looked up symptoms, before coming to jail, and that's why he was concerned. He doesn't know if he was in contact with anyone. He had been sick two to three days before coming to jail. His cough was dry. His O2 was 94 percent. His pulse was 98. He didn't have any nasal drainage. No body aches. Eating well. And he wasn't taking much fluid. So I encouraged him to increase his fluids.

(*Id.*, PageID.868; ECF 69-2, PageID.573.)   On October 14, 2020, nurse Hickmott wrote:

> And he mumbled some words and some words were clear.   He denied any kind of pain. He's been eating all of his meals. He was walking in his cell. He gets – he gets himself up off the floor. He moves his arms and legs well. His skin is warm and dry again. His respirations were easy. No coughing noted. He seems alert, but he won't talk when spoken to. He follows commands when asked.

(ECF No. 69-7, PageID.871; ECF No. 69-2, PageID.574.) On October 15, 2020, she noted:

> Alert. Responds to verbal commands. Speaks some words clearly and correctly. Mumbles some. He makes eye contact. He moves all of extremities. He ate his breakfast and his lunch, most of it, but only a little bit of his dinner. He's sleeping most of the day, but he wakes up and responds when spoken to. His lung sounds were clear bilaterally. And he's laying on the mat on the floor. And that his vital signs on the side.

16

(ECF No. 69-7, PageID.871-872; ECF No. 69-2, PageID.574.)   Nurse Hickmott testified that she was not aware that Plug had hypertension, because that was not reflected in his file.   (*Id*., PageID.885.)

First, Nurse Hickmott testified that she was aware that Plug entered the jail with methamphetamine withdrawal symptoms, and she was aware or should have been aware of his medical state at the time of booking because those records were available for the medical team to review.   Nurse Hickmott observed and examined Plug on October 9, 14, and 15.   She was aware initially that Plug was coughing and had shortness of breath for several days.   By October 14, 2020, she noted that he "mumbled some words" but "follows commands when asked." (ECF No. 69-7, PageID.871; ECF No. 69-2, PageID.574.)   On October 15, she noted that he "[m]umbles some" and ate a little of his dinner but was sleeping most of the day on the floor.   She further indicated that he had elevated blood pressure readings.   The Narrative Progress Notes for those days state:

| Date/Time | Narrative Note |
|---|---|
| 10-14-2020 | Spoke ā inmate informed him of his test results (Covid negative) - mumbled some words. Some words clear. Denies pain. Eats all meals |
| O₂ sat 99% pulse 65 | walks in cell gets self up off the floor. Moves arms + legs well. Skin warm + dry - resp Easy no coughing noted. Seems alert - but |
| BP 147/100 | won't talk when spoken too. Follows commands when asked. RHeckmott BSN R |
| 10-15-2020 | Alert - responds to verbal commands - speaks some words clear + correctly - mumbles some |
| 97⁶ 140/98 | makes eye contact. moves all extremities ate breakfast + lunch most of it, but only |
| pulse 85 | a little dinner. Sleeping most of the day |
| O₂ sat 99% | but wakes up + responds when spoken too. Clear lung sounds noted bil lungs. laying on matt on the floor. RHeckmott BSN |

(ECF No. 69-2, PageID.574.)

The hospital medical records state:

**HPI**
Nicholas is a 35-year-old male patient that comes to us from the jail. The patient has a history of marijuana as well as methamphetamine abuse. He has been in the jail for approximately 11 days. The jail noted that a couple days ago he was acting somewhat odd. They felt that his behavior really significantly changed this morning but he did have some element of odd behavior yesterday. The behaviors that they noted were that he was urinating on himself. They noted that he was having difficulty feeding himself. They also felt that his

Printed on 11/10/21 3:30 PM                                                    Page 1

05/10/2022 15:25 FAX  2696571217          The_UPS_Store                      ☑002/055

 **BRONSON**  408 Hazen St
Paw Paw MI 49079-1040

Plug, Nicholas Cory
MRN: 0005331194, DOB: 2/2/1985, Sex: M
Adm: 10/16/2020, D/C: 10/16/2020

**ED Provider Notes - Encounter Notes (continued)**

ED Provider Notes by Mark Joseph Dzwik, MD at 10/16/2020 12:22 PM (continued)

speech was off. The patient is difficult to get much history from. The patient clearly has some degree of aphasia and cannot find the correct words although I do not think that he is truly confused. The patient will follow commands. He will answer questions to the best of his ability. He told me he did not use any drugs since he got into jail. He denied any headache. He denied any chest pain or shortness of breath. He denied any weakness or numbness in his arms or legs.

(ECF No. 69-4, PageID.649-650.) Plug suffered a stroke while incarcerated in the jail:

The patient presented from jail with some alteration in mental status. At first I was not certain if he truly had aphasia or if he was just trying to get out of jail. Certainly does not make sense for someone of his age to have had a stroke. He has not been on any drugs for at least 11 days. The jail noted that he was not talking right yesterday as well as he was urinating on himself. The patient was taken over to CT scan and unfortunately showed a large acute infarction in the left frontal lobe in the MCA territory. There is no hemorrhage there was some mild mass-effect with 3 mm of left-to-right midline shift. There is also some patchy hypoattenuation in the frontal lobes which could represent areas of other infarction. The patient is not in any dysrhythmia such as atrial fibrillation. The patient has no carotid bruits on my exam. The patient has no distinct murmur to suggest endocarditis although he does use methamphetamines. The patient will be sent to Bronson Methodist Hospital. He will require further stroke work-up. He was given an aspirin here. The patient will ultimately need an echo and possibly an angiogram of his head and neck. I spoke to Dr. Todd Bennett for admission. No deterioration in his mental status while here. There was also no improvement of his mental status while here.

(*Id.*, PageID.652.)

**IMPRESSION:**
Cerebrovascular disease -- Acute large left MCA/Bilateral ACA strokes distribution ischemic infarction. Neurological examination is notable for Expressive > receptive aphasia. Etiologies may include embolic (artery-artery or central embolic), intracranial atherostenosis/thrombosis, microangiopathic, arterial dissection, prothrombotic state, or inflammatory such as vasculitis/vasculopathy . Major risk factors for cerebrovascular disease include IVDU, ETOH, Methamphetamine use, obese, male Based on current clinical data and test results, stroke is most likely due to TBD. Reason(s) for IV tPA exclusion Outside of time window/unknown time of onset. Patient excluded from endovascular therapy due to Outside of time window

Polysubstance abuse, no drugs or ETOH in 10 days

(*Id.*, PageID.656.)

Dr. Todd Bennett determined that Plug "likely" came to the hospital 48 hours after his stroke:

**PLAN:**
Agree with above. Neurology asked for admission to the NCCU to monitor neurology exam closely for concern of post infarct cerebral edema. Patient seems to have presented later in process so likely already 48 hours past stroke event. Echocardiogram to evaluate for source of embolic stroke.

Todd C Bennett, DO
IMHS
10/16/2020
9:20 PM

(*Id.*, PageID.670.)

Nurse Hickmott saw Plug as early as October 9, 2020, and continued to monitor his medical needs on October 14 and 15. She was at least aware that he was withdrawing from methamphetamine, and had elevated blood pressure readings, was mumbling, unresponsive, sleeping most of the day by October 15, and not eating all his meals. In the opinion of the undersigned, Nurse Hickmott was aware that Plug had a serious medical need or should have been aware of that need. Additionally, a reasonable jury could conclude that Plug was in distress and needed medical intervention "that only a hospital could provide" and was deliberate indifferent to a serious medical need. *Helphenstine*, 60 F.4th at 322. Further, a jury could

20

conclude that the treatment Nurse Hickmott provided was "so cursory as to amount to no treatment at all."  *Id.*   This conclusion is consistent with Plug's expert medical witness, Dr. Lucia Zamorano, M.D., F.A.C.S., whose expert opinion is that if Plug was taken to the hospital earlier as soon as October 14, 2020, he could have been treated with "more invasive treatments, potentially reversing some or all of his aphasia symptoms."  (ECF No. 58-1, PageID.323.)

## V.  Qualified Immunity

Defendant Kelly and Hickmott argue that they are entitled to dismissal of the complaint against them based upon qualified immunity.  "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Phillips v. Roane Cty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).   Once a defendant raises the qualified immunity defense, the burden shifts to the plaintiff to demonstrate that the defendant officer violated a right so clearly established "that every 'reasonable official would have understood that what he [was] doing violate[d] that right.'"  *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).   The analysis entails a two-step inquiry.   *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013).   First, the court must "determine if the facts alleged make out a violation of a constitutional right."   *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (1982)).   Second, the court asks if the

right at issue was "'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it." *Id.* (citing *Pearson*, 555 U.S. at 232). A court may address these steps in any order. *Id.* (citing *Pearson*, 555 U.S. at 236). A government official is entitled to qualified immunity if either step of the analysis is not satisfied. *See Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016).

In applying the first step of the qualified immunity analysis, a court must identify "the specific constitutional right allegedly infringed" and determine whether a violation occurred. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The court considers the state of the law at the second step. As the Supreme Court has observed, "this Court's case law does not require a case directly on point for a right to be clearly established, [but] existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (internal quotation marks and original brackets omitted) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). As explained by the Supreme Court:

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam), which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority,' " *al–Kidd*, *supra*, at 741–742, 131 S.Ct. 2074 (quoting *Wilson v. Layne*, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. *See Reichle*, 566 U.S., at 666, 132 S.Ct. 2088. Otherwise, the rule is not one that "every reasonable official" would know. *Id.*, at 664, 132 S.Ct. 2088 (internal quotation marks omitted).

22

The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). This requires a high "degree of specificity." *Mullenix v. Luna*, 577 U.S. ——, ——, 136 S.Ct. 305, 309, 193 L.Ed.2d 255 (2015) (per curiam). We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff*, *supra*, at 2023 (internal quotation marks and citation omitted). A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established." *Anderson*, *supra*, at 641, 107 S.Ct. 3034. In the context of a warrantless arrest, the rule must obviously resolve "whether 'the circumstances with which [the particular officer] was confronted ... constitute[d] probable cause.'" *Mullenix*, *supra*, at 309 (quoting *Anderson*, *supra*, at 640–641, 107 S.Ct. 3034; some alterations in original).

*D.C. v. Wesby*, 583 U.S. 48, 63-64 (2018).

In the qualified immunity context, if the facts alleged and evidence produced, viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that the officer violated a clearly established constitutional right, dismissal by summary judgment is inappropriate. *Barton v. Martin*, 949 F.3d 938, 947 (6th Cir. 2020) (citing *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009)).

In the opinion of the undersigned, Defendant Deputy Kelly is entitled to qualified immunity.   The evidence in the record shows that Deputy Kelly documented Plug's symptoms during booking and he placed Plug in an observation cell.   Moreover, during his next documented encounter with Plug on October 16, Deputy Kelly called the jail doctor and obtained authorization for Plug to be sent to the hospital.   There is no evidence in the record which could show that Deputy Kelly

23

violated clearly established law.   Under these circumstances, there is no genuine issue of material fact entitling Deputy Kelly to qualified immunity.

However, Defendant nurse Hickmott examined Plug on three occasions including October 14 and 15.   Nurse Hickmott was aware that Plug exhibited withdrawal symptoms, and at least initially that he was coughing and had shortness of breath.   Although Nurse Hickmott was not aware that Plug was prescribed high blood pressure medication, she took blood pressure readings that were high, she noted that he was mumbling, not eating all his meals, and was sleeping on the floor most of the day.   In the opinion of the undersigned, a genuine issue of material fact exists regarding whether Nurse Hickmott acted recklessly by not seeking further treatment for Plug's symptoms and medical condition.   For these reasons, it is recommended that the Court deny summary judgment to Nurse Hickmott.

### VI.   Municipal Liability

Plug sues Van Buren County and Sheriff Abott in his official capacity under *Monnell v. Dep't. of Soc. Servs. Of the City of New York*, 436 U.S. 658 (1978).[3]   A municipality is not subject to § 1983 liability "for an injury inflicted solely by its

---

[3]      Plaintiff relies upon Dr. Peters, Ph.D.'s opinion to support his claims of municipal liability.   Plaintiff failed to timely disclose Dr. Peter's expert report.   In the order denying Plaintiff's motion to extend the deadlines to disclose expert reports, the Court explained that it had twice extended the deadline.   Plaintiff's motion to extend the deadline was denied because Plaintiff failed to show good cause to extend the deadline or excusable neglect to comply with the deadline.   (ECF No. 49.) Accordingly, the Court cannot consider Dr. Peter's expert opinion because the untimely report is not admissible.   Nevertheless, Plaintiff filed a motion to permit the testimony of Dr. Peter's. (ECF No. 58.)   The Court addresses that motion by separate order.

employees or agents." *Kovalchuk v. City of Decherd*, 95 F.4th 1035, 1038 (6th Cir. 2024) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).   Instead, the municipality can only be held liable "for [its] own illegal acts." *Id.*   (alteration in original) (quoting *Connick v. Thompson*, 563 U.S. 51, 60 (2011)).   Where a municipal employee harms a private party, that party must show that the employee's unconstitutional conduct stems from a municipal "policy or custom." *Coleman v. Hamilton Cnty. Bd. of Cnty. Comm'rs*, 130 F.4th 593, 599 (6th Cir. 2025).

There are four recognized avenues for a plaintiff to establish a municipality's policy or custom: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)).   "Even after showing an unlawful policy or custom, a plaintiff must also demonstrate a direct causal link between the policy and the alleged constitutional violation in order to show that the municipality's deliberate conduct can be deemed the 'moving force' behind the violation." *Jones v. Louisville/Jefferson Cnty. Metro Gov't*, 482 F. Supp. 3d 584, 597 (W.D. Ky. 2020) (quoting *Spears*, 589 F.3d 249 at 256 (cleaned up)).

In *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001), the Sixth Circuit held that if "no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983."

Generally, if no constitutional violation can be attributed to an individual municipal actor, it is unlikely that the plaintiff was deprived of a constitutional right at all. *North v. Cuyahoga Cnty.*, 754 F. App'x 380, 390 (6th Cir. Nov. 5, 2018).   More recently, the Sixth Circuit has recognized that "in certain unusual circumstances, a municipality might be liable for a constitutional violation even in the absence of a liable individual."   *Hart v. Hillsdale Cnty., Michigan*, 973 F.3d 627, 645 (6th Cir. 2020); *Winkler v. Madison Cnty.*, 893 F.3d 877, 900 (6th Cir. 2018).   A *Monell* claim against a municipality may proceed without a claim against an offending officer, so long as it remains consistent with a finding of a constitutional violation.   *Stucker v. Louisville Metro Gov't*, No. 23-5214, 2024 WL 2135407, at *6 (6th Cir. May 13, 2024). There exists "scenarios when no officer may have acted unconstitutionally, but the municipality has nonetheless inflicted constitutional harm of a victim – such as a lack of action due to the failure to train, or where there are systematic problems with the health care system in the County jail."   *Grote v. Kenton Cnty.*, 85 F. 4th 397, 414 (6th Cir. 2023).

Initially, Plug failed to identify a policy or procedure that was implemented by Van Buren County that violated his rights.   Specifically, Plug alleges that Defendants implemented "policies, practices, or procedures which deny incarcerated individuals (including Plaintiff) who manifest signs of drug withdrawal, proper housing and observation in a detoxification cell", and deny proper medical care for serious medical needs.   (ECF No. 1, PageID.12.)   To defeat a Rule 56 motion for summary judgment a plaintiff must show:    (1) the existence of a clear and persistent

26

pattern that violates individual rights; (2) notice or constructive notice; (3) tacit approval amounting to deliberate indifference evidencing an official policy of inaction; and (4) that custom resulted in the alleged constitutional deprivation. *Wallace v. Coffee Cnty*, 852 F. App'x. 871, 876 (6th Cir. 2021).   Plug has failed to identify a Van Buren County policy or procedure that violated his Fourteenth Amendment rights.

Moreover, to the extent that the County allegedly failed to implement policies that required individuals undergoing drug withdrawal symptoms to be housed in detox cells, Plaintiff has failed to show how he was harmed by the lack of a detox cell. Plaintiff was initially placed in an observation cell on October 5, 2020, and monitored by jail staff.   The evidence indicates that his stroke occurred more than a week later – likely 48 hours before he was taken to the hospital on October 16, 2020.   In the opinion of the undersigned, Plug has failed to show each of the factors set forth in *Wallace* necessary to defeat summary judgment to support his claim that Van Buren County implemented a policy or procedure that violated his Fourteenth Amendment rights.

Next, Plaintiff alleges that Defendant County and Sheriff Abott failed to adequately train and supervise corrections officers or implement policies "for the need for medical care which arose when there was not a health care professional present." (ECF No. 1, PageID.11-12.)

Although Plug styles his failure-to-train-or-supervise claim or to implement policies or procedures against Abott in his official capacity, such a claim "is treated as a suit against the municipality." *Doe v. Claiborne Cnty., Tenn. By & Through*

27

*Claiborne Cnty. Bd. of Educ.*, 103 F.3d 495, 509 (6th Cir. 1996).  Failure-to-train under *Monell* is broader than an individual-capacity claim; it "implicate[s] the conduct of a defendant supervisor insofar as he acted with deliberate indifference in his official capacity as a policymaker."  *Essex v. Cnty. of Livingston*, 518 F. App'x 351, at 355 (6th Cir. 2013) (citations omitted).  "There are two ways to support a claim that a failure to train or supervise is the result of a municipality's deliberate indifference.  Plaintiff may prove (1) a 'pattern of similar constitutional violations by untrained employees' or (2) 'a single violation of federal rights, accompanied by a showing that [the municipality] has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation.'"  *Helphenstine*, 60 F.4th at 323 (quoting *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 738-39 (6th Cir. 2015)).  Plaintiff has not identified any other constitutional violations, so he may impose liability by showing that a single violation – his stroke and subsequent symptoms – were caused by the failure to train Van Buren County employees on recurring situations involving drug withdrawal.  *Id*.

Therefore, Plaintiff must show three elements to establish his claim that the failure to train employees to handle issues involving "medical care . . . when there was not a health care professional present" (ECF No. 1, PageID.11-12) amounts to deliberate indifference:   (1) that the County's 'training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury.'" *Id*., (quoting *Winkler*, 893 F.3d at 902).

28

In the opinion of the undersigned, Plaintiff has failed to establish these elements and the record supports the conclusion that no genuine issue of material fact exists on this issue.   First, it is important to note that Plaintiff has presented no evidence showing that a medical professional was not present at the jail at the time he suffered his stroke or first exhibited stroke symptoms.   Plaintiff alleges that Nurse Hickmott should have elevated his medical care based upon her observations of Plaintiff's symptoms.   Moreover, when Defendant Kelly spoke with Plaintiff on October 16, he noticed that Plug was in medical distress and telephoned the jail doctor to obtain approval to send Plug to the hospital.

Therefore, Plug has not established that the county's jail staff training was inadequate for circumstances where no medical staff are present in the jail.   Jail staff could telephone a doctor and obtain approval to send an inmate to the hospital. This is exactly what Defendant Kelly did in this case.   Moreover, there exists no evidence that any other jail staff observed Plug in distress.   Rather, Plug has alleged and presented evidence showing that Defendant nurse Hickmott should have elevated his medical care and treatment based upon her examinations of Plug on October 14 or October 15.   Therefore, it is recommended that the Court grant Defendants Van Buren County and Sheriff Abott's motion for summary judgment because no genuine issue of material fact exists.

## VII.   Recommendation

Accordingly, it is respectfully recommended that the Court grant Defendants' motion for summary judgment motion in part and deny it in part.   It is recommended

that the Court grant Defendants Kelly, Abott, and Van Buren County summary judgment because no genuine issue of material facts exists entitling them to summary judgment.   It is further recommended that the Court deny Defendant Hickmott summary judgment because a genuine issue of material fact exists regarding whether Nurse Hickmott acted with reckless disregard to Plug's serious medical needs.

NOTICE TO PARTIES:   Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation.   28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b).   Failure to file timely objections constitutes a waiver of any further right to appeal.   *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).   *See also Thomas v. Arn*, 474 U.S. 140 (1985).

Dated:    October 23, 2025                     /s/ *Maarten Vermaat*
                                                          MAARTEN VERMAAT
                                                          U.S. MAGISTRATE JUDGE